## Webber et al. v. The Indiana National Bank.

1. . *Practice in Appellate Courts—Instructions to be Printed in the Abstract.*—Where a part only of the instruction given on behalf of the defendants in error, and none of those given on behalf of the plaintiff are printed in the abstract, under the practice in this State, the court may refuse to consider the errors assigned on the instructions.

2. *Instructions as a Series—Notice to an Assignee of Commercial Paper.*—A series of instructions upon the question of notice to an assignee of commercial paper which assert the law on the subject to be, "Where the bill has passed to the plaintiff without any proof of bad faith in him, and there is no objection to his title, suspicion of defect of title or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, it will not defeat his title; that result can only be produced by bad faith on his part," properly state the law.

3. *Commercial Paper—Rights of an Assignee.*—The duty of active inquiry does not rest on the purchaser of commercial paper, to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence.

4. *Commercial Paper—Rights of an Assignee—The General Doctrine.*—It is clear, from the authorities, that the general doctrine of the law applicable to the purchaser of commercial paper, which is, that notice of facts which should excite inquiry in the minds of a reasonably prudent person, is notice of the ultimate fact which such inquiry would have disclosed, is not applicable to the assignment, before maturity, of such commercial paper as notes. They enter so largely, as a convenient medium, like money, into exchange or trade, stimulating business activity and sustaining, to a great extent, the commercial prosperity of a country, that public policy requires they shall be given almost the freedom of money in passing from hand to hand. Therefore notice of the ultimate act (and not merely notice of evidentiary facts, which should excite inquiry and which if pursued, would, by the exercise of diligence, lead to a knowledge of the ultimate fact,) is essential to be established, to impair the title of an assignee of a note, before maturity.

5.  *Commercial Paper—Purchaser Before Maturity—Notice.*—A speculative issue which is necessarily involved as to the diligence or negligence of an assignee, before maturity, of commercial paper, in following up or failing to follow up inferences suggested by evidentiary facts, will not be permitted.

6.  *General Operation of the Rule.*—While the rigid rule of law applicable to the transfer of negotiable paper may, in isolated instances, work a hardship. yet in its general operation, the effect of the rule upon the business and property interests of the people, is largely beneficial in the increased value and use of such instruments, to those who make or hold them.

7.  *Commercial Paper—Purchaser with Notice.*—A purchaser, before maturity, of commercial paper, who takes the same with a full knowledge of defenses, stands in no better situation than the person to whom such paper was originally made payable.

8.  *Evidence—Evidentiary Facts—Evidence of the Ultimate Fact.*—Upon the issue of notice in the assignee of commercial paper, evidentiary facts may be shown for the purpose of proving the ultimate fact of notice of the defense; but such fact must be established, which, when done, constitutes bad faith of the assignee in the language of the law.

9.  *Agency—Evidence of—Statements of the Agent.*—The declarations of an agent are not of themselves evidence of the fact of his agency.

10.  *Notice to an Agent, Notice to his Principal.*—Notice to an agent of a fact within the scope of his agency is notice to his principal, yet such notice does not extend beyond the transaction covered by the agency.

Memorandum.—Action of assumpsit on promissory notes.   Writ of error to the Circuit Court of St. Clair County, to reverse a judgment rendered therein; the Hon. GEORGE W. YOUNG, Judge.   Heard in this court at the August term, A. D. 1891, and affirmed.   Opinion filed September 8, 1893.

The opinion of the court states the case.

PLAINTIFF'S BRIEF, BOYER & CHOISSER, ATTORNEYS.

Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led; every unusual circumstance is ground of suspicion and prescribes inquiry. Russell v. Ranson, 76 Ill. 167; Babcock et al. v. Lisk, 57 Ill. 327; Murray v. Beckwith, 48 Ill. 391.

It makes no difference whether defendant in error had actual notice or not.   Notice to its attorney was notice to it.   Williams v. Tatnall, 29 Ill. 564.

DEFENDANT'S BRIEF, W. F. SCOTT AND PARISH & PARISH, ATTORNEYS.

. The party who takes commercial paper before due for a valuable consideration, without any knowledge of any defect of title and in good faith, holds it by a title valid against all the world. Suspicion of defect of title, or the knowledge of circumstances which would excite suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title. That result can only be produced by bad faith on his part. The burden of proof lies on the person who assails the right claimed by the party in possession. Murray v. Lardner, 2 Wall. (U. S.) 110; Chapman v. Rose, 56 N. Y. 137; Magee v. Badger, 34 N. Y. 247; Shreeves v. Allen, 79 Ill. 553; Comstock v. Hannah, 76 Ill. 530; Goodman v. Harvey, 4 A. & E. 870.

If Stanton was the attorney for the Nordyke & Marmon Co., and acting for it at the time he acquired the information he did from the Webbers, then, even had he afterward become the attorney of plaintiff, yet the latter would not be bound by any notice so received. McCormick v. Wheeler, Mellick & Co., 36 Ill. 114, 121.

OPINION OF THE COURT, SAMPLE, J.

On the 21st day of June, 1887, the plaintiffs in error made a written contract with the Nordyke & Marmon Company to furnish certain milling machinery, use certain second-hand machinery of plaintiffs in error, and place the same in their mill in complete order, so that when operated by a competent miller, it should be capable of producing fifty barrels of flour of all grades in twenty-four hours, both in quality and yield, as good as any other mill in the State of Illinois using like grades of wheat, for the consideration of the sum of $5,000, $2,500 to be paid as the work progressed, and the balance to be evidenced by three notes for $833, $833 and $834, due respectively, in six, twelve and eighteen months from their date, drawing seven per cent interest, secured by mortgage on the mill property. In a short time after the

work was completed and the mill put in operation, on the 9th day of November, 1887, the three notes provided for in the contract were executed and delivered by the plaintiff in error to the Nordyke & Marmon Company, of Indianapolis, Indiana, which had business relations with "The Indiana National Bank," the defendant in error, of the same city.

Amos K. Hallowell, who was the financial and general manager of the Nordyke & Marmon Company, testified that the first and second of said notes were discounted to the Indiana National Bank, the first one on the 29th day of November, 1887, for $833 and interest, the second one was discounted for the same amount, during his absence, on the 1st day of August, 1888, the net proceeds of which, on the same day, were entered to the credit of his company.

This was done in pursuance of an arrangement with the bank that it would discount the company's paper at any time it was in need of funds, and the notes were sent to the bank from time to time for that purpose, as the demands of the company required, which arrangement covered any and all of the company's paper that the bank might deem good. He further says that most of their paper was deposited with the bank as collateral security on money borrowed, and as the bank's vaults were safe places to keep their customer's paper, most of it was turned over to the bank in that way, largely as a measure of safety, and as he understands, these notes took that course, although he does not say when the bank first received possession of them, or what became of the third note, other than at the time of the discount, Arthur C. Newby, the bookkeeper of the company, testified that "the first note was given to me by Mr. Hallowell, and I was instructed to mark it as discounted, and we received credit from the bank for it. The other one, the second one—Mr. Hallowell being absent at the time—I consulted with Mr. Nordyke. We were in need of funds, and on the 1st of August, 1888, he told me to discount some of our paper, and I selected eight pieces of paper from our pocket-book—the book of notes, with a view to the

time it matured, and also to our future needs, and discounted them, for which we received a credit in our bank book of $5,431.91 for the whole lot. I did not take the notes up in either case; they were sent by a messenger. On the 23d day of April, 1888, the defendant in error sent the first note to a bank at Harrisburg, Illinois, for collection, which was presented, and payment refused on the ground of a failure in the contract of warranty. The note was returned to defendant in error on the 13th day of June, 1888. From the 23d day of April, until the 13th day of June, the Harrisburg bank cashier claims the note was not out of his possession. About the last of April Mr. Stanton, an attorney, went to see plaintiffs in error, to settle up the whole matter of the difficulty about the mill as claimed by the plaintiffs in error, but no settlement was effected. It is claimed by the elder Webber that Stanton had two notes, although not certain of it, and by the younger Webber that he had only one note—the first one. The former says he did not claim that he was representing the defendant in error, while the latter says he did so claim. Both agree, however, that he was informed of the defenses to the note, whichever one it was; there is no other evidence in this record as to Stanton, except that above stated. The first note was returned again to the bank at Harrisburg, on August 3, 1888, and sent back again on August 6th. On August 9th it was returned to the Harrisburg bank, and by it handed to an attorney for collection.

After the maturity of the second note, this suit was brought on the first and second notes and the defense before alluded to was set up in special pleas with an averment of notice to defendants in error before purchase. On trial before a jury, a verdict was returned for the full amount of the notes, which was sustained by the court after overruling a motion for new trial. The record shows there was a conflict in the evidence as to whether or not there was a breach of warranty, but the evidence would seem to show that there was not a full compliance with the terms of the warranty, although under our view of the case we do not deem

it necessary to enter upon a review of the evidence on that point. The principal point made and relied upon by plaintiffs in error is, that the verdict was the result of erroneous instructions given on behalf of the defendant in error as to the law of notice to an assignee of notes. Only a part of the instructions given on behalf of the defendants in error, and none of those given on behalf of plaintiffs in error are printed in the abstract which, under the practice of the Supreme and Appellate Courts of this State would authorize us to refuse to consider the errors assigned in the instructions. The record, however, has been examined and the instructions considered as a series.

The instructions particularly objected to, are as follows: " In order to defeat a promissory note in the hands of a *bona fide* holder, it is not enough to show that. he took it under circumstances calculated to excite suspicion. To defeat the note in his hands it must appear by a preponderance of evidence that he was guilty of a want of honesty or bad faith in acquiring it." " Where a person takes an assignment of a promissory note for a valuable consideration before due, and is not guilty of bad faith, even though he may be guilty of gross negligence, he will hold it by a title valid against the world, and it will not be subject to the defense of failure of consideration in his hands."

The sixth one of which instructions reads as follows: " The indorsement of a negotiable promissory note before maturity, taking it as payment or security for a pre-existing debt, and without any express agreement, is deemed a holder for valuable consideration, in the ordinary course of trade, and holds it free from latent defenses on the part of the maker."

The instructions given for the plaintiff in error on this point were as follows: " You are instructed that the term, bad faith, simply means the absence of good faith, and that a purchaser of commercial paper who takes the same with a full knowledge of defenses which would be availing as against the original payee, stands in no better situation with reference to such defense, than the person to whom such paper was originally made payable, and in this case if you

find from the weight of the evidence that the defendants would be entitled to succeed on the ground of a failure of consideration as against the Nordyke & Marmon Company, if they were plaintiffs, and that plaintiff took the notes or either of them with full notice of such defense, then this is sufficient proof of an absence of good faith."

" If you should find from the evidence that the consideration for which said notes were given has failed, and that after they were delivered to the Nordyke & Marmon Company, they were deposited with the plaintiff merely as collateral security, the plaintiff did, through its agent or attorney, receive notice of such failure of consideration, and that after receiving such notice the plaintiff discounted said notes and thereby became the owner of the same, then, and in that case, the plaintiff can not be allowed to claim that it is an innocent holder of said notes, and that it received them in good faith, without notice, and you should find for the defendant." These instructions as a series, on the question of notice to an assignee, properly state the law.

The Supreme Court in the case of Comstock et al. v. Hannah, 76 Ill. 530, say : " We accept the doctrine of cases as correct in principle which assert the law on this subject to be, 'when the bill has passed to the plaintiff without any proof of *bad faith* in him there is no objection to his title;' and " suspicion of defect of title, or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title. That result can only be produced by bad faith on his part.' And 'the duty of active inquiry does not rest on the purchaser of commercial paper to avert the imputation of bad faith.` The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a *speculative issue* as to his diligence or negligence.' " The counsel for plaintiffs in error cite cases of the Supreme Court decided at an earlier date than the Comstock case, apparently supporting their contention that notice of facts that would excite inquiry, are of themselves, in the eye of

the law, notice of the ultimate fact which such inquiry would have disclosed *as to an assignee* of a note before maturity; yet in the above case it is said, "there never has been more than an incidental assumption without discussion that such was the rule," and that "we find nothing in previous decisions which should conclude us from adopting what, upon investigation, we are satisfied is the correct doctrine in principle, and the prevailing rule of law." See also Shreeves v. Allen, 79 Ill. 553, and Murray et al. v. Beckwith, 81 Ill. 43, which last case holds that "the maker, who alone is responsible for the paper becoming an article of commerce, can not be permitted to defeat payment unless he can establish the fact that the holder purchased with notice. The sale and transferring of promissory notes enter largely into the commerce of the country, and public policy requires that an innocent purchaser should be protected." The doctrine of the Comstock case is approved in the case of Siegel et al. v. Chicago Trust & Sav. Bank, 131 Ill. 569, at p. 574. It is clear from these authorities, the general doctrine that notice of facts that should excite inquiry in the minds of a reasonably prudent person is notice of the ultimate fact which such inquiry would have disclosed, is not applicable to the assignment before maturity of such commercial paper as notes. They enter so largely as a convenient medium, like money, into exchanges or trade, stimulating business activity, and sustaining to as great extent the commercial prosperity of a country, that public policy requires they shall be given almost the freedom of money itself, in passing from hand to hand. Therefore, notice of the ultimate fact, and not merely notice of evidentiary facts, which should excite inquiry that, if pursued, would, by the exercise of diligence, lead to a knowledge of the ultimate fact, is essential to be established to impair the title of an assignee of a note before maturity. A speculative issue, which is necessarily involved, as to the diligence or negligence of such an assignee, following up, or failing to follow up, inferences suggested by such evidentiary facts, will not, as held in the Comstock case, be permitted. While such a rigid rule of law as applicable to the

transfer of negotiable paper may, in isolated instances, work hardships, yet in its general operation, the effect of the rule upon the business and property interest of the people, is largely beneficial in the increased value and use of such instruments to those who make or hold them. The counsel for plaintiff in error say that in the teeth of the authorities the court told the jury on behalf of defendant in error by the first of the above instructions "that plaintiffs in error, to sustain their defense, must actually convict the defendant in error of dishonesty and bad faith, and that circumstances, though strong enough to excite the suspicions of defendants in error, could not be considered by them. We say this instruction is not the law of this case." It will be observed that the plaintiffs in error, in their first instruction above quoted, told the jury that "a purchaser of commercial paper, who takes the same with a *full knowledge of defenses,* * * * stands in no better situation * * * than the person to whom such paper was originally made payable." Their other instructions given by the court, are substantially to the same effect. This statement of the law is in harmony with those given for the defendant in error, and with the decisions of the Supreme Court; for *knowledge* of defenses, before taking such a note, would be bad faith on the part of the assignee. There is a vast difference, however, between "knowledge of defenses," which is knowledge or notice of the ultimate fact, and knowledge of merely evidentiary or inferential facts, whereby, if the inferences are pursued, that is, if diligence is exercised, the ultimate fact will be discovered, or, negligently failing to pursue the inferences which should excite inquiry, it is not discovered. As is said in the Comstock case, "gross negligence may be evidence of *mala fides,* but it is not the same thing;" and the assignee's rights are not to be determined "by a speculative issue as to his diligence or negligence." The error of counsel seems to be in not observing this distinction in the law. Evidentiary facts may be shown for the purpose of proving the ultimate fact of notice of the defense, but such fact must be established, which, when done, constitutes bad faith. In the lan-

guage of the defendant in error's instruction of which complaint is made, " It is not enough to show that he took it under circumstances calculated to excite suspicion." The sixth instruction given for the defendant in error standing alone might be misleading. Its evident purpose was to state the law as to one taking a note before maturity to secure or pay a pre-existent debt. The conclusion of the instruction that such taker "holds it free from *latent* defenses on the part of the maker," when considered in connection with the issue that was made as to notice and the other instructions given for the plaintiffs in error would not mislead the jury, for a " latent defense" would be taken to mean an " unknown defense." The word latent means " not seen; hid; concealed; secret."

The question remaining as to notice is one of fact. Did the defendant in error have actual notice of a defense to the notes in suit ? Counsel for plaintiffs in error concede there is no proof of notice as to the first note; was there notice as to the second note ? There is no proof that the defendant in error ever sent the second note to any one for collection, unless it is under the claim that the attorney, Stanton, was its agent, and then had such note in his possession when he went to see the Webbers to settle the whole matter. As heretofore stated the elder Webber did not know which note he had in his possession. It might have been the third note for all he knew, as he testified. H. M. Webber was asked :

Q. Do you know which note he had with him ? A. It was the first note, I think; that is my recollection.

He further says he did not look at the date, or read the note.

Q. You are sure that it was the first note ? A. Certainly I am.

He further states that Stanton wanted to settle the whole matter. The cashier of the Harrisburg bank swears that he had this note at that time, and his books confirm his testimony. It is undisputed that the defendant in error did not discount the second note until August 1, 1888, nearly

three months after the time Stanton was to see the Webbers. There is no proof that Stanton was the attorney for the defendant in error in this or any other transaction, except from the inference to be drawn from his alleged possession of the first note. His declaration of agency is not of itself proof of the fact.

It is not conceivable under the evidence that the defendant in error sent Stanton there to settle the whole matter, when at that time it had no interest in fact, except in the first note, and there is not a scintilla of evidence to show that it had any authority from Nordyke & Marmon Company to settle anything. If he was the attorney of the defendant in error for that purpose, then it had notice of a defense to the notes in view of the statements of the Webbers, but the officers of the defendant in error bank, who had charge of the bank's paper, and must have known of such fact if it existed, all testify that they had no notice from any source of a defense to the notes, or either of them, before their purchase. Nordyke & Marmon Company officers testify they did not notify defendant in error, and Hall's letter returning the first note, as cashier of the Harrisburg bank, on the 13th of June, 1888, introduced in evidence, shows that he did not notify defendant in error of any defense. In view of all the facts and the inferences to be drawn therefrom the jury might find as a fact that Stanton did not have either the first or the second note in his possession, and that in no event was he the agent of the defendant in error. As at that time no one except Nordyke & Marmon Company had any power to clothe Stanton with the authority to settle the whole matter, it being assumed that the company retained the third note, as it is not accounted for in this record, the inference is that he was acting for that company. If this is correct then the only evidence of notice is that the defendant in error's agent, the Harrisburg bank, had notice of a defense to the first note and therefore notice of a defense to the second note.

It is true that notice to an agent as to a fact within the scope of his agency is notice to the principal, yet such notice

does not extend beyond the transaction covered by the agency; therefore, notice to the agent of a defense to the first note, was not of itself notice of a defense to the second note, unless the defendant in error knew the two notes related to the same transaction and were based upon the same consideration.

There is no proof that it did know this as a fact. The only evidence tending to show such knowledge on its part, is the fact of the identity of the notes as to dates, names, etc. If the evidence of Newby is true, then the defendant in error did not have possession of this second note until August 1, 1888—more than eight months after it had received the first note. Even if the evidence of Hallowell is correct, and Newby is in error, then the identity of the notes alone, under the circumstances they were received, would only be an evidentiary fact that there was a defense to the second note because there was to the first. Of itself it would not be such conclusive evidence of notice as to estop the defendants in error from claiming want of notice. In view of all the facts, the jury were justified in finding that the defendant in error did not have notice of a defense to either of the notes in suit before their purchase. It is therefore not necessary to consider other questions raised on this record.

The judgment is affirmed.